UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT WINCHESTER

| | | |
|---|---|---|
| MARTHA PRATER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 4:08-CV-83 |
| v. | ) | |
| | ) | *Mattice / Lee* |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**REPORT AND RECOMMENDATION**

This action was brought by Plaintiff Martha Prater ("Plaintiff") pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying Plaintiff disability insurance benefits ("DIB"). Plaintiff seeks the award of benefits, or in the alternative, a remand to the Commissioner. Plaintiff has moved for judgment on the administrative record [Doc. 14] and Defendant has moved for summary judgment [Doc. 17]. For the reasons stated below, I **RECOMMEND**: (1) Plaintiff's motion for judgment on the administrative record [Doc. 14] be **GRANTED**; (2) Defendant's motion for summary judgment [Doc. 17] be **DENIED**; (3) the decision of Commissioner be **REVERSED**; and (4) this action be **REMANDED**.

**I.     ADMINISTRATIVE PROCEEDINGS**

In her application for DIB, Plaintiff alleged she had been disabled since December 18, 2003 (Tr. 52). Her claim was denied initially and on reconsideration (Tr. 43, 47). Plaintiff requested a hearing, which was held by video on February 14, 2007 (Tr. 13). The Administrative Law Judge

("ALJ"), found that Plaintiff was not disabled from the date of her alleged disability through the date of his decision, April 5, 2007 (Tr. 22). On September 12, 2008, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (Tr. 5).

## II.     ELIGIBILITY FOR DISABILITY BENEFITS

The Social Security Administration ("SSA") determines eligibility for disability benefits by following a five-step process. 20 C.F.R. § 404.1520(a)(4)(i-v). If at any step in this process the claimant is determined to be disabled or not disabled, the process ends. *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001).

> 1) If the claimant is doing substantial gainful activity, the claimant is not disabled.
>
> 2) If the claimant does not have a severe medically determinable physical or mental impairment--i.e., an impairment that significantly limits his or her physical or mental ability to do basic work activities--the claimant is not disabled.
>
> 3) If the claimant has a severe impairment(s) that meets or equals one of the listings in Appendix 1 to Subpart P of the regulations and meets the duration requirement, the claimant is disabled.
>
> 4) If the claimant's impairment does not prevent him or her from doing his or her past relevant work, the claimant is not disabled.
>
> 5) If the claimant can make an adjustment to other work, the claimant is not disabled.

*Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647 (6th Cir. 2009). The claimant bears the burden of proof at the first four steps, but the burden shifts to the Commissioner at step five to show there are jobs the claimant can perform. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997).

## III. FACTUAL BACKGROUND AND ALJ'S FINDINGS

### A. Plaintiff's Complaints

Plaintiff was 48 years old on the date of the hearing (Tr. 434). She completed the eleventh grade (Tr. 76). She worked as an assembler from 1991 until 2003, performing "highly repetitious" work assembling hair clippers, when she stopped working because she was reportedly holding up production (Tr. 65, 72, 440). Plaintiff testified that her work difficulties were caused by neck and shoulder pain (Tr. 435). She testified her past work required her to sit without allowing her to change position, but she could not perform seated work anymore because of her neck pain (Tr. 440-41). Plaintiff alleges her pain is exacerbated by activity, stress, and cold weather (Tr. 78).

According to Plaintiff, she has a driver's license and drives "some," although her husband drove her to the hearing (*id.*). She testified she can stand about 20 minutes at a time, and can walk on a treadmill between 20 and 30 minutes at a time (Tr. 437). She attends to her own personal care and can perform some chores, but she testified she has to "go easy" and she does only "easy" cooking like preparing sandwiches (Tr. 438). She stated she goes grocery shopping with her husband (Tr. 439). Plaintiff stated she has trouble concentrating, but she can "sometimes" follow the story when watching a television show (Tr. 437-48).

Plaintiff's use of pain medications is of some importance here. At the hearing, Plaintiff stated that her medications do not cause her any side effects and reduce her pain from "eight and a half I'd say or a nine" on a ten-point scale to "six or a seven" (*id.*). In a pain questionnaire, Plaintiff reported taking ibuprofen for pain, but stated it did not stop the pain (Tr. 101). She seemed to deny using narcotic pain relievers because they "might help pain but I believe it would create some other problems" (*id.*). On her medications list, however, she listed Oxycodone, Darvocet, and Ultram as

3

her current pain medications (Tr. 116). She also reported using Alprazolam, an anxiety medication, for pain relief (Tr. 102).

B.      **Plaintiff's Treatment History**

The first treatment notes for Plaintiff's neck and shoulder pain date from 1999 (Tr. 369-70), although Plaintiff apparently began suffering from those complaints in 1996 (Tr. 374).[1] In 1999, Plaintiff sought relief from a chiropractor (Tr. 370). In January, 2002, she was treated by Rodger Zwemmer, M.D., for shoulder pain (Tr. 120). Plaintiff reported that Aleve was not effective in relieving her shoulder pain, and Dr. Zwemmer diagnosed her with tendinitis and prescribed Decadron and Darvocet (Tr. 66, 120). Plaintiff again sought treatment from Dr. Zwemmer several months later for neck pain (Tr. 120). Plaintiff lacked extension and flexion and could not turn her head to the left, and x-rays showed loss of the normal cervical lordosis (*id.*). Dr. Zwemmer prescribed Flexeril and Prednisone. Six months later, after four follow up appointments, Dr. Zwemmer observed that Plaintiff "just doesn't seem to be making any progress. Her neck x-rays are the same, if not worse." (Tr. 122). He recommended an MRI (*id.*), which revealed several abnormalities in her cervical spine, including two small central disc protrusions with minimal neural compression, a severe right foraminal stenosis, and an irregular large central protrusion creating a moderate stenosis (Tr. 65, 128).

Robert Dimick, M.D., noted that Plaintiff was experiencing "progressively increasing left sided neck pain" that "conservative efforts were unsuccessful in alleviating" (Tr. 130). Dr. Dimick performed a diskectomy and cervical fusion in December, 2002 (Tr. 65, 130-33, 193). After her

---

[1] Plaintiff has sought treatment for other ailments, including hip pain and sleep apnea, but she challenges the ALJ's credibility assessment only with respect to her allegations of chronic pain. For that reason, this review of the evidence focuses on those complaints.

4

surgery, Plaintiff received physical therapy, and her therapist's notes record that her goals included to be "able to return to work" (Tr. 135). In May, 2003, Plaintiff requested to return to work full time, and she received permission to do so (Tr. 167, 169). One month later, however, she returned to Dr. Dimick complaining of neck pain due to "prolonged [neck] flexion" while performing her job (Tr. 167, 169). Dr. Dimick counseled Plaintiff to consider alternative types of jobs because of a possible "mismatch between [her] physiological capabilities and the physical demands of her job (Tr. 169). Nonetheless, at Plaintiff's request, she was temporarily released to continue working no more than 40 hours per week (*id.*). Thereafter, during periodic visits to Dr. Dimick, she reported gradually increasing neck pain, shoulder pain, and increased job stress (Tr. 169, 171). Plaintiff was prescribed pain medications during the months after her surgery, including Ultracet, Ultram, and Lortab (Tr. 186-87).

On January 6, 2004, Plaintiff reported she had begun to fall behind on her production goals and had received a note from her supervisor that disciplinary action might be taken against her (Tr. 170, 181). Dr. Dimick opined that her increasing pain was "secondary to psychosocial stressors." (Tr. 182). He placed her "off work" for two weeks, but counseled her that further time off "w[ould] be contingent on further objective findings." (Tr. 182). At that time, testing did not reveal a specific cause of Plaintiff's increased pain (Tr. 170, 175, 177-78, 182). Dr. Dimick opined that Plaintiff "seem[ed] to focus on obtaining disability payments for which a minimal [sic] of 6 weeks off work is required." (Tr. 182). On January 22, 2004, Plaintiff again saw Dr. Dimick and reported her employer was planning to go to "lean manufacturing" (Tr. 175). Dr. Dimick discussed the possibility of disability benefits with Plaintiff and placed her "off work" for six more weeks (Tr. 170).

In March, 2004, after being placed on "off work" status, Plaintiff reported to Dr. Dimick that she had been involved in an incident at work in July, 2003, in which she had to "dodge a rod" protruding from a passing forklift (Tr. 167-68). She told Dr. Dimick that she attributed her increased pain to that incident and informed him that she was planning to pursue a workers' compensation claim (*id.*). Dr. Dimick, however, was unable to say whether the reported incident was the cause of her increased pain (Tr. 168, 172). Dr. Dimick performed a physical exam and noted that Plaintiff was "[v]ery tired, very stressed," and complained of "localized pain" with limited neck mobility (Tr. 171). She also complained of shoulder pain and weakness, which Dr. Dimick opined was "more consistent with deconditioning rather than the rotator cuff injury." (*id.*). He noted that Plaintiff had been taking Darvocet and Vioxx daily, and he prescribed refills of those medicines as well as Flexeril (*id.*).

In April, 2004, Plaintiff saw Brian D. Chastain, M.D., and reported she was unable to see Dr. Dimick any longer until she paid her bill (Tr. 200). She also reported her workers' compensation claim had been denied, but she had hired an attorney (*id.*). Plaintiff told Dr. Chastain she was unable to keep up with work quotas, and she asked him for a "note to keep her off work for perhaps 2 months" pending the outcome of her workers' compensation claim (*id.*). In July, 2004, Michael Moran, M.D., released Plaintiff to work with permanent restrictions: no lifting greater than 15 pounds and no overhead work (Tr. 239). In August, 2004, Plaintiff was treated for shoulder pain by Robert Landsberg, M.D., who gave her an injection of Xylocaine and Celestone (Tr. 381). Dr. Landsberg also prescribed Skelaxin, a muscle relaxant, and noted that Plaintiff was taking Vioxx (Tr. 379, 381). Two months later, Plaintiff told Dr. Landsberg that the Skelaxin didn't help and she had stopped taking Vioxx when it was taken off the market (Tr. 374). At that time, she was taking

only Xanax for anxiety (Tr. 375).

In October, 2005, Plaintiff returned to Dr. Dimick's office for the first time since March, 2004, and related a "complicated insurance coverage situation" (Tr. 340). Plaintiff reported pain and muscular fatigue. Dr. Dimick opined that Plaintiff's "situation is complicated by her lifelong battle with depression, complicated with anxiety and what sounds like sleep apnea. Therefore, she is restless and tires, aggravating underlying perception of pain and her ability to deal with it." (Tr. 341). In order to get "up-to-date information" on his patient (Tr. 342), Dr. Dimick referred Plaintiff for electrodiagnostic testing, which revealed moderate bilateral carpal tunnel syndrome (Tr. 320-21). MRI scans of Plaintiff's neck and shoulder were also performed at that time. The MRI of Plaintiff's neck was unremarkable, but the shoulder MRI showed either tendinopathy or a tear in her left shoulder (Tr. 336-37). The following month, Dr. Dimick referred Plaintiff to Sean Kaminsky, M.D., for a shoulder evaluation, which revealed instability, crepitation, tenderness, atrophy, and impingement in her left shoulder (Tr. 324-25). At that time, Plaintiff was not taking narcotic pain relievers, but was taking ibuprofen (Tr. 324). Dr. Kaminsky discussed the possibility of conservative treatments with Plaintiff, but Plaintiff was "very frustrated" with her lack of success with similar strategies and elected to have Dr. Kaminsky perform arthroscopic shoulder surgery, as he had recommended (Tr. 329). Dr. Kaminsky did request approval for the surgery from Plaintiff's workers' compensation insurance (Tr. 326, 329), but it is unclear whether approval was ever granted, and for whatever reason, the surgery was not performed (Tr. 21). Dr. Kaminsky placed Plaintiff on work restrictions: Plaintiff was to limit work that would require her arms to be in an outstretched or overhead position, perform no repetitive activities, and avoid lifting more than ten pounds (Tr. 327).

7

Charles Morgan, M.D., treated Plaintiff from September, 2005, until December, 2006 (Tr. 390-97). Dr. Morgan's treatment notes are not extensive, but he did prescribe Plaintiff with Percocet, Darvocet, Lortab, and Prednisone. Dr. Morgan also opined that Plaintiff could not raise her arms above shoulder level and was limited to standing or sitting only 30 minutes at a time, working two hours per day, and lifting five pounds occasionally and no weight frequently (Tr. 387).

C. **Consultative Evaluations**

In August, 2004, Walter Wheelhouse, M.D., performed an independent medical evaluation, apparently in conjunction with Plaintiff's workers' compensation claim (Tr. 243). He opined, to a reasonable degree of medical certainty, that Plaintiff had sustained a work related injury and had reached maximum medical improvement (*id.*). Dr. Wheelhouse opined Plaintiff could not return to her former job and was permanently limited to avoiding frequent use of her left arm or neck; twisting, bending, or turning her neck frequently; holding her neck in a fixed position; reaching, lifting, or pulling over her shoulder level or in an outstretched position; or lifting over 15 pounds occasionally (*id.*). Dr. Wheelhouse observed that Plaintiff was "fully cooperative and pleasant throughout her evaluation" (Tr. 244).

Less than a month after Dr. Wheelhouse's examination, Plaintiff was evaluated by Rodney Caldwell, Ph.D. (Tr. 65-67). He administered a manual dexterity test, and concluded Plaintiff "does not have the hand speed to perform production, clerical, or service jobs. . . . She basically has no useful manual dexterity." (Tr. 66). Dr. Caldwell opined that, considering the restrictions given by Dr. Wheelhouse, Plaintiff had a vocational disability "approaching 100%." (Tr. 67).

An independent medical examination was performed in October, 2004, by Dr. Landsberg, again in conjunction with Plaintiff's workers' compensation claim. Dr. Landsberg had treated

8

Plaintiff only two months earlier for shoulder pain (Tr. 374-81). He opined only with respect to Plaintiff's shoulder impairments due to "the July 2003 injury" (Tr. 374, 377). Dr. Landsberg calculated a 2% upper extremity impairment rating and assigned several permanent restrictions: minimal lifting above the left shoulder and occasional use of the left arm above shoulder level, and rarely lifting a maximum of three to five pounds (Tr. 377-78).

In April, 2005, Plaintiff was evaluated by Timothy Fisher, D.O., who opined that "she will have difficulty doing jobs which require any extensive lifting overhead or turning her head." (Tr. 291-92). He opined further that Plaintiff could stand and walk six to eight hours daily and could grip and manipulate objects weighing one to ten pounds frequently and ten to 15 pounds occasionally (Tr. 292). Later that month, Arthur Miller, M.D., reviewed Plaintiff's file and opined Plaintiff could lift 50 pounds occasionally and 25 pounds frequently, could stand or sit six hours in a workday, but was limited in reaching and lifting overhead (Tr. 294-95). He concluded, without having examined Plaintiff, that Dr. Fisher's assessment was too restrictive in light of the examination and that Plaintiff was only "partially credible" (Tr. 298).

**D.  Vocational Expert Testimony and ALJ's Findings**

At step one, the ALJ found that Plaintiff had not engaged in gainful activity since the date of her application (Tr. 15). At step two, the ALJ found that Plaintiff had several impairments, which were severe in combination: status post cervical spine fusion, history of sleep apnea, shortness of breath, and history of tendinitis in the left shoulder (*id.*). The ALJ concluded at step three, however, that none of Plaintiff's impairments was severe enough to meet any listing (*id.*). The ALJ then evaluated Plaintiff's RFC and found she was able to perform a reduced range of light work activity: she could grip and manipulate objects weighing one to ten pounds frequently and ten to fifteen

9

pounds occasionally; she would have difficulty with extensive lifting overhead or turning her head; she could walk/stand or sit, with normal breaks, for no more than six to eight hours in a workday; and she would have moderate loss of concentration due to moderate pain (Tr. 17).

The ALJ presented a vocational expert ("VE") with a hypothetical claimant of Plaintiff's education and work experience and limited to the same RFC assigned to Plaintiff (Tr. 449-50). The VE testified that such a claimant could not perform any of Plaintiff's past work. The VE went on to testify, however, that there were significant numbers of sedentary unskilled jobs, including assembler, inspector/testor, and general production worker, that would accommodate those hypothetical restrictions (Tr. 450). Assuming the accuracy of Plaintiff's testimony, however, the VE testified Plaintiff could not perform any of those jobs, or any other jobs existing in significant numbers in the region (*id.*).

Despite the VE's testimony that a claimant with Plaintiff's limitations could not perform any of Plaintiff's prior work, the ALJ found at step four that Plaintiff could perform past relevant work as an assembler and was therefore not disabled (Tr. 22). The ALJ interpreted the VE's testimony as opining that Plaintiff could perform the job of assembler with the job duties "generally required by employers throughout the national economy," even though she could not perform the duties of an assembler in her "*particular* past relevant job[]" (Tr. 21-22) (emphasis added). Consequently, the ALJ did not reach step five.

IV. **ANALYSIS**

Plaintiff challenges the ALJ's decision on two grounds. First, Plaintiff contends the ALJ "glaring[ly] and obvious[ly]" erred in finding she could perform her past relevant work because the VE testified she could not perform any of her prior work [Doc. 14-1 at 8]. Second, Plaintiff

challenges the ALJ's finding that her allegations were "not fully credible," arguing that the medical evidence "completely contradicts" this adverse credibility determination [*id.*].

## A. Standard of Review

A court must affirm the Commissioner's decision unless it rests on an incorrect legal standard or is unsupported by substantial evidence. 42 U.S.C. § 405(g); *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) (quoting *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997)). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). Furthermore, the evidence must be "substantial" in light of the record as a whole, "tak[ing] into account whatever in the record fairly detracts from its weight." *Id.* (internal quotes omitted). If there is substantial evidence to support the Commissioner's findings, they should be affirmed, even if the court might have decided facts differently, or if substantial evidence would also have supported other findings. *Smith v. Chater*, 99 F.3d 780, 782 (6th Cir. 1996); *Ross v. Richardson*, 440 F.2d 690, 691 (6th Cir. 1971). The court may not re-weigh evidence, resolve conflicts in evidence, or decide questions of credibility. *Garner*, 745 F.2d at 387. The substantial evidence standard allows considerable latitude to administrative decisionmakers because it presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

The court is under no obligation to scour the record for errors not identified by the claimant, *Howington v. Astrue*, 2009 WL 2579620, *6 (E.D. Tenn. Aug. 18, 2009) (stating that assignments of error not made by claimant were waived), and arguments not raised and supported in more than

a perfunctory manner may be deemed waived, *Woods v. Comm'r of Soc. Sec.*, 2009 WL 3153153, at *7 (W.D. Mich. Sep. 29, 2009) (citing *McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997)) (noting that conclusory claim of error without further argument or authority may be considered waived). Nonetheless, the court may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).

    **B.    ALJ's Finding at Step Four**

        **1.    Did the ALJ Err at Step Four?**

Plaintiff argues that the ALJ's finding that Plaintiff could perform past relevant work was error because "[t]he VE quite unequivocally testified that a person with [the limitations found by the ALJ] could not return to any of her prior work." [Doc. 14-1 at 8] The portion of the VE's testimony at issue is as follows:

> ALJ: Could [a] person with [Plaintiff's] limitations [as found by the ALJ] return to any of the prior work?
>
> VE: No, sir.
>
> ALJ: Could that person perform any jobs and the numbers in the region?
>
> VE: Yes, Your Honor.
>
> ALJ: Okay. Examples please?
>
> VE: Yes. At the sedentary unskilled level such a person could perform the duties of assembler with 700 positions in the region and 26,000 in the United States that would allow for those restrictions. Inspector/tester with 400 positions in the region and 39,000 in the United States, as well as general production worker with 900 positions in the region and 29,000 in the United States.
>
> ALJ: Are these examples or an exhaustive list?
>
> VE: Those would be examples, Your Honor.

12

> ALJ: You've heard the Claimant's testimony, if her testimony was given full credibility would she be able to perform any of the above listed jobs?
>
> VE: No, sir.
>
> ALJ: Could be able to perform any jobs in significant numbers in the region?
>
> VE: No, Your Honor.

(Tr. 450-51). The ALJ relied on this testimony to find that Plaintiff was able to perform the job of assembler as it is generally performed in the region, although not as she had performed it in her previous job (Tr. 21-22). As the ALJ pointed out, a finding that the claimant can perform past relevant work at step four may be supported by her ability to perform either the actual duties of a past job *or* her ability to perform the duties of the job "as generally required" (Tr. 22). 20 C.F.R. § 404.1560(b)(2); Social Security Ruling ("SSR") 82-61. *See also Studaway v. Sec'y of Health & Human Servs.*, 815 F.2d 1074, 1076 (6th Cir. 1987) (a claimant "must prove 'an inability to return to his former *type* of work and not just to his former job.'"). Furthermore, a VE's testimony, if elicited in response to a question that accurately describes the claimant's limitations, is substantial evidence regarding the jobs a claimant can perform. *Colvin v. Barnhart*, 475 F.3d 727, 732 (6th Cir. 2007). Thus, if the VE did in fact testify that Plaintiff could perform the job of assembler as it is generally performed, the testimony would support the ALJ's finding that Plaintiff was not disabled at step four.

The ALJ's understanding of the VE's testimony, however, appears to have been mistaken. The VE testified that a person with the impairments assigned to Plaintiff "could perform the duties of assembler with 700 positions in the region and 26,000 in the United States *that would allow for those restrictions*." (Tr. 450) (emphasis added). The ALJ apparently understood this testimony to mean that there are 700 assembler positions in the region, and that these jobs would generally

accommodate Plaintiff's restrictions. The VE's testimony, however, should be read to mean that there is a *subset* of 700 assembler positions in the region that would accommodate those restrictions. This latter interpretation is both more grammatical and more plausible. First, the relative pronoun "that" is generally used to introduce a *restrictive* relative clause--i.e., one that modifies a subset of a larger class.[2] Furthermore, the "region" the VE was describing is the state of Tennessee (Tr. 449), and notwithstanding these difficult economic times, it is difficult to imagine that the entire state of Tennessee has only 700 assembly jobs. I **FIND** the ALJ misinterpreted the VE's testimony. Because the VE testified only with respect to a *subset* of assembly jobs, no evidence exists to support the ALJ's finding with respect to assembly jobs *in general*. I therefore **CONCLUDE** the ALJ's finding that Plaintiff could perform past relevant work as it is generally performed was not supported by substantial evidence.

### 2. Was the Error Harmless?

The Commissioner seems to concede as much: he argues that although the "ALJ appears to have misunderstood the vocational expert's testimony, . . . the ALJ's error was harmless . . . ." [Doc. 18 at 17]. An error is harmless if its correction would not change the outcome for the claimant. *Rabbers*, 582 F.3d at 654 (quoting *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969)) ("courts are not required to 'convert judicial review of agency action into a ping-pong game' where 'remand would be an idle and useless formality.'"). On the other hand, an error cannot be considered harmless where it leaves the agency's decision without any justification, even if a reviewing court can imagine other rationales supporting the decision. *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943) (holding that a reviewing court cannot affirm an agency's decision on a rationale

---

[2] "Which," on the other hand, is generally used to introduce a *nonrestrictive* relative clause--i.e., one that modifies *all* members of the named class.

14

the agency did not provide in its decision).

Consequently, where the ALJ's decision provides findings in the alternative, either one of which provides substantial support for the decision, the decision must be affirmed. *Garcia v. Comm'r of Soc. Sec.*, 2009 WL 2843922, at *11 (E.D. Mich. 2009) (holding that an ALJ's error at step four was harmless "because the ALJ went on to make a step five determination of whether there is other work in the economy which Plaintiff can perform."). If, on the other hand, the ALJ fails to make alternative findings and chooses to rest the decision on a single ground, an error on that ground will require reversal. *O'Dell v. Astrue*, 2009 WL 4827074, at *6 (D. Kan. 2009) (remanding where the ALJ erred at step four and did not make an alternative step-five finding); *Biggs v. Astrue*, 2009 WL 330021, at *1 (E.D. Cal. 2009) (same).

Because the ALJ erred at step four, therefore, the Commissioner's decision can be affirmed only if the ALJ also found in the alternative, with the support of substantial evidence, that Plaintiff was capable of making an adjustment to "other work" existing in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(a)(4)(v); 404.1560(c)(1). Here, the ALJ did not make an explicit step-five finding. The ALJ did, however, observe in his step-four discussion that "[i]n fact, the vocational expert identified other jobs at the light exertion, unskilled level such as other assembly jobs, inspectors/testers, and general production worker" that Plaintiff could perform (Tr. 22). The Court must determine whether this observation may be considered a "finding" at step five.

Initially, as Plaintiff points out, the ALJ misstated the VE's testimony. The VE testified that these were "sedentary" unskilled jobs, not "light" unskilled jobs (Tr. 450). The ALJ's misstatement of the VE's testimony suggests that the sentence was added merely as an afterthought, and not as a reasoned step-five finding. Furthermore, even if the ALJ had accurately restated the VE's

testimony, this sentence would be at best a citation of evidentiary support for the step-five finding, and not the finding itself. *See* 42 U.S.C. § 405(a)(1) (the decision must "stat[e] the Commissioner's determination *and* the reason or reasons upon which it is based.") (emphasis added). I **FIND** the ALJ did not make an alternative step-five finding. Therefore, because the ALJ's error at step four leaves the Commissioner's decision wholly without justification, I **CONCLUDE** the decision must be reversed and remanded.

The Commissioner protests that remand would serve no useful purpose because "[t]he evidence establishes that Plaintiff could still be disabled at step-five." [Doc. 18 at 18]. That the evidence adduced at the hearing *could* support the same outcome at step five, however, is largely irrelevant to the Court's inquiry. Substantial evidence review, as noted above, "presupposes there is a zone of choice within which the decisionmakers can go either way, without interference by the courts. *Felisky*, 35 F.3d at 1035. The decision whether a claimant is disabled and the findings of fact necessary to reach that decision are entrusted solely to the Commissioner, and even a high probability that the result will be the same on remand does not shift that authority to a reviewing court. 42 U.S.C. § 405(a)(1). I therefore **RECOMMEND** this matter be **REMANDED** to the Commissioner for further proceedings consistent with this opinion.

### C. ALJ's Credibility Determination

Plaintiff also challenges the ALJ's assessment of her credibility. The ALJ found that Plaintiff's "medically determinable impairments could reasonably be expected to produce [her] alleged symptoms," but he rejected her complaints as "not entirely credible" (Tr. 20). The ALJ concluded:

> [T]he claimant's complaints of pain and incapacitation are not credible when viewed in light of the medical findings. The claimant does not attend pain management for

her symptoms nor has she been referred to a pain specialist for her reported symptoms of severe or chronic pain.

(Tr. 21). The ALJ also stated that Dr. Kaminsky had recommended a surgery that Plaintiff had never received and opined that if she had undergone that surgery, "it would weigh more in her credibility of unrelenting and severe pain symptoms." Additionally, and of importance here, the ALJ stated, "the record reveals that she had no previous prescription pain medication, until recently." (Tr. 20). Plaintiff contends the ALJ improperly evaluated her credibility because the record shows she used prescription pain medications from 2002 through the date of the hearing.

An ALJ must consider "the claimant's allegations of h[er] symptoms . . . with due consideration to credibility, motivation, and medical evidence of impairment." *Atterberry v. Sec'y of Health and Human Servs.*, 871 F.2d 567, 571 (6th Cir. 1989). Credibility assessments are properly entrusted to the ALJ, not to the reviewing court, because the ALJ has the opportunity to observe the claimant's demeanor during the hearing. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). Thus, where an ALJ's credibility assessment is fully explained and not at odds with uncontradicted evidence in the record, it is entitled to great weight. *King v. Heckler*, 742 F.2d 968, 974-75 (6th Cir. 1984) (noting the rule that an ALJ's credibility assessment is entitled to "great weight," but "declin[ing] to give substantial deference to the ALJ's unexplained credibility finding," and holding it was error to reject uncontradicted medical evidence). *See also White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009) (ALJ was entitled to "rely on her own reasonable assessment of the record over the claimant's personal testimony").

The ALJ is not free, however, to make a credibility judgment based solely on intuition, but must find support for that judgment in the record, and must explain the determination sufficiently

17

to make clear to subsequent reviewers the weight given to the testimony and the reasons for that weight. SSR 96-7p; *Rogers*, 486 F.3d at 247-48. Among the factors the ALJ may consider are the claimant's use of medication and any other pain relief treatment. 20 C.F.R. § 404.1529(c)(3). A claimant's "[p]ersistent attempts . . . to obtain relief of pain," such as trials of different medications, increasing dosages, or referrals to specialists, will support her allegations of pain. SSR 96-7p. On the other hand, "if the level or frequency of treatment is inconsistent with the level of complaints, or if . . . the individual is not following the treatment as prescribed and there are no good reasons for this failure[,]" the claimant's allegations will be less credible. *Id.*

Here, the ALJ based his adverse credibility determination on Plaintiff's lack of treatment by a pain management specialist, her failure to obtain a recommended surgery, and the absence of prescription pain medication "until recently." On this latter ground, the Commissioner concedes, the ALJ "overstated matters" [Doc. 18 at 14 n.11]. This misstatement of the record should be considered upon remand as the record shows Plaintiff took a variety of prescription medications throughout her treatment, including narcotic and non-narcotic pain medications, muscle relaxants, steroidal anti-inflammatories, and NSAIDs.[3] *See Meece v. Barnhart*, 192 F. App'x 456, 464-65 (6th Cir. 2006) (holding that the use of non-prescription pain relievers along with prescription medications did not undercut a claimant's credibility). Likewise, on remand consideration should be given to whether Plaintiff's failure to obtain the surgery recommended by Dr. Kaminsky, a surgery which she requested (Tr. 239), could also be explained by her "complicated" insurance situation (Tr. 340). *See* SSR 96-7p (ALJ should consider other explanations for a claimant's failure

---

[3] The record shows the following prescriptions: in 2002, Decadron, Darvocet, Flexeril, and Prednisone (Tr. 120); in 2003, Ultracet, Ultram, and Lortab (Tr. 186-87); in 2004, Darvocet, Vioxx, Flexeril, Xylocaine, Celestone, and Skelaxin (Tr. 379, 381); and in 2006-06, Percocet, Darvocet, Lortab, and Prednisone (Tr. 390-97).

18

to obtain treatment). In addition, while the ALJ correctly noted that Plaintiff had not received a referral to or treatment by a pain management specialist, she has received chiropractic care, physical therapy, surgery, and injections of medication, none of which were discussed in conjunction with the ALJ's credibility finding. Without foreclosing the possibility that there may be substantial evidence in the record to support a finding that Plaintiff's complaints are not fully credible, on remand the Commissioner should thoroughly assess Plaintiff's allegations of disabling pain in light of the record as a whole.

      **D.**     **Remedy**

Plaintiff seeks the award of benefits, or in the alternative, a remand under sentence four of 42 U.S.C. § 405(g). A reviewing court may award benefits only if "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994). Because I conclude the decision of the Commissioner must be reversed for failing to make a finding at step five of the sequential evaluation, the essential factual issue of whether Plaintiff is capable of making an adjustment to other work has not been established. This matter must therefore be remanded for further consideration.

**V.**    **CONCLUSION**

Having carefully reviewed the administrative record and the parties' pleadings, I

**RECOMMEND:**[4]

    (1) Plaintiff's motion for judgment on the administrative record [Doc. 14] seeking remand under Sentence Four of 42 U.S.C. § 405(g) be **GRANTED**.

    (2) Defendant's motion for summary judgment [Doc. 17] be **DENIED**.

    (3) The Commissioner's decision denying benefits be **REVERSED** and **REMANDED** pursuant to Sentence Four of 42 U.S.C. § 405(g) for action consistent with this Report and Recommendation.

                                        s/Susan K. Lee
                                          SUSAN K. LEE
                                          UNITED STATES MAGISTRATE JUDGE

---

[4] Any objections to this report and recommendation must be served and filed within 14 days after service of a copy of this recommended disposition on the objecting party. Such objections must conform to the requirements of Rule 72(b) of the Federal Rules of Civil Procedure. Failure to file objections within the time specified waives the right to appeal the district court's order. *Thomas v. Arn*, 474 U.S. 140, 149 n.7 (1985). The district court need not provide *de novo* review where objections to this report and recommendation are frivolous, conclusive and general. *Mira v. Marshall*, 806 F.2d 636, 637 (6th Cir. 1986). Only specific objections are reserved for appellate review. *Smith v. Detroit Fed'n of Teachers*, 829 F.2d 1370, 1373 (6th Cir. 1987).